# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2019-NMSC-021

Filing Date: November 14, 2019

No. S-1-SC-37201

**GANDYDANCER, LLC,**

Plaintiff-Respondent,

v.

**ROCK HOUSE CGM, LLC,**
**AND KARL G. PERGOLA,**

Defendants-Petitioners.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Clay Campbell, District Judge**

Released for Publication December 17, 2019.

Butt, Thornton & Baehr, P.C.
Michael P. Clemens
Rodney L. Schlagel
Rheba Rutkowski
Albuquerque, NM

for Petitioners

The New Mexico Law Group, P.C.
Robert Neil Singer
Albuquerque, NM

Adams Corporate Law, Inc.
Addison K. Adams
Santa Ana, CA

for Respondent

## OPINION

**THOMSON, Justice.**

**{1}** The district court certified for interlocutory review whether the New Mexico Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended 2019), supports a cause of action for competitive injury. The Court of Appeals accepted interlocutory review and held that a business may sue for competitive injury based on a plain reading of the UPA. *Gandydancer, LLC v. Rock House CGM, LLC*, 2018-NMCA-064, ¶ 1, 429 P.3d 338. We reverse because the Legislature excluded competitive injury from the causes of action permitted under that statute. We further observe that *Gandydancer* relied upon dicta in *Page & Wirtz Construction Co. v. Soloman*, 1990-NMSC-063, ¶ 22, 110 N.M. 206, 794 P.2d 349. Therefore, we formally disavow reliance on *Page & Wirtz* or prior New Mexico case law that conflicts with this opinion.

## I.    BACKGROUND

**{2}** GandyDancer, LLC, and Rock House CGM, LLC, are business competitors, and both provide railway construction and repair services to BNSF Railway Company. BNSF awarded contracts to Rock House to provide goods and services in New Mexico.

**{3}** GandyDancer filed a complaint with the New Mexico Construction Industries Division (CID) in 2015 that alleged Rock House violated the Construction Industries Licensing Act (CILA), NMSA 1978, §§ 60-13-1 to -59 (1967, as amended through 2013), by performing unlicensed construction work in New Mexico. CID is the state agency charged with investigating violations and prosecuting actions to enforce CILA. *See* § 60-13-9(G) (providing that CID "shall . . . employ such personnel as the division deems necessary for the exclusive purpose of investigating violations of [CILA]"). CID and Rock House entered into a stipulated settlement agreement resolving the alleged licensing violations.

**{4}** GandyDancer thereafter filed a complaint in district court against Rock House. The complaint alleges theories of competitive injury, including a claim that Rock House engaged in unfair methods of competition to obtain contracts with BNSF contrary to the UPA. GandyDancer alleges that Rock House's acts amount to an "unfair or deceptive trade practice" under Section 57-12-2(D) of the UPA, because:

> [Rock House] knowingly made false and misleading statements to GandyDancer employees that [Rock House] solicited and to BNSF by failing to disclose that: (i) [Rock House] did not have the necessary experience or licenses to provide railroad contracting services; (ii) [Rock House was] not authorized by the State of New Mexico to provide such services; (iii) [Rock House was] able to provide lower bids and non-bid time and material rates because they failed to comply with New Mexico's contractor licensing laws, Department of Transportation registration and tax regulations, Federal Rail Safety Administration safety regulations, and other violations set forth above and to be proved at trial and, thus did not incur any expenses related to such compliance; and (iv) [Rock House was] at risk of being enjoined by the State of New Mexico for contracting

without a license and that such an injunction would cause work at BNSF's project to stop.

GandyDancer seeks damages under the UPA on a theory that had Rock House disclosed its licensure status, BNSF would have awarded GandyDancer the contracts. We note that BNSF is the consumer of services in this case but is not a party and has not asserted any claims in this action.

**{5}** Rock House filed a motion to dismiss the complaint, arguing in part that the UPA did not provide a competitor standing to sue. In other words, Rock House argued that the UPA does not create a cause of action for competitive injury. The district court denied Rock House's motion to dismiss the UPA claim and certified the question, "whether the [UPA] affords private-party standing to business competitors who are both sellers of services, or only to buyers of goods and services," for interlocutory review. The Court of Appeals accepted review, affirmed the district court, and held that "a business may sue a competitor under the UPA only if the conduct alleged involves consumer protection concerns or trade practices addressed to the market generally." *Gandydancer*, 2018-NMCA-064, ¶ 1.

## II.    DISCUSSION

## A.    Standard of Review

**{6}** This Court reviews de novo whether a plaintiff has a cause of action or standing to sue under the UPA. *See San Juan Agric. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 8, 150 N.M. 64, 257 P.3d 884 (observing that a cause of action or standing created by statute is a question of law).

## B.    The Legislature Limited the Right to Pursue a Cause of Action Under the UPA

**{7}** In general, standing in New Mexico courts "is not derived from the state constitution, and is not jurisdictional." *Deutsche Bank Nat'l Trust Co. v. Johnston*, 2016-NMSC-013, ¶ 11, 369 P.3d 1046 (internal quotation marks and citation omitted). However, "[w]here the Legislature has granted specific persons a cause of action by statute, the statute governs who has standing to sue." *San Juan Agric. Water Users*, 2011-NMSC-011, ¶ 8 (citing *ACLU of N.M. v. City of Albuquerque*, 2008-NMSC-045, ¶ 9 n.1, 144 N.M. 471, 188 P.3d 1222). "Standing then becomes a jurisdictional prerequisite to an action" because standing is interwoven with subject matter jurisdiction. *Deutsche Bank*, 2016-NMSC-013, ¶ 11 (internal quotation marks and citation omitted).

**{8}** GandyDancer and Rock House argue over whether the UPA contemplates *competitor standing*. However, a more precise framing of the issue is whether the UPA creates a cause of action to recover lost profits damages from a competitor. "A cause of action is defined as an 'aggregate of operative facts which give rise to a right enforceable in the courts.'" *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 11, 121

N.M. 764, 918 P.2d 350 (citation omitted). This Court has determined that there is no significant difference between having standing to sue and having a cause of action under the UPA. *Id.* ¶¶ 10-12. So whether this Court discusses it as a cause of action or standing, "both doctrines allow plaintiffs to enforce a right in the courts." *Id.* ¶ 11. A plaintiff must demonstrate that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute." *Id.* (internal quotation marks and citation omitted).

**{9}** GandyDancer argues that the cause of action created by the UPA should be broadly construed because there is no explicit "statement of legislative purpose" in the UPA, and therefore that the Legislature intended the UPA to police the marketplace against unfair trade practices generally, *not only* for the protection of consumers. GandyDancer further argues that this Court should overrule all precedent construing the purpose of the UPA to be the protection of innocent consumers, because "we don't need to protect a consumer" so long as the UPA protects the market.

**{10}** Although the Court of Appeals did not go as far as GandyDancer urged, it nonetheless construed the UPA to permit competitor standing so long as the competitor alleges a loss of money or property resultant from any unlawful act "involv[ing] consumer protection concerns or trade practices addressed to the market generally." *Gandydancer*, 2018-NMCA-064, ¶ 20. We respectfully disagree. The historical amendments to the UPA limited the zone of interest protected. Harmonizing the UPA with its foundational principle and existing law allows only one conclusion: Currently, the UPA does not provide a cause of action for competitive injury claims.

## 1.     The statutory text and a preliminary construction

**{11}** The Legislature created a private cause, for "[a]ny person who suffers any loss of money or property . . . as a result of any employment by another person of a method, act or practice declared unlawful by the [UPA, to] bring an action to recover actual damages . . . ." Section 57-12-10(B). Concerning the specific acts prohibited, the UPA declares that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." Section 57-12-3. The UPA defines an "unfair or deceptive trade practice" as

> an act specifically declared unlawful pursuant to the Unfair Practices Act, a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services or in the extension of credit or in the collection of debts by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person . . . ."

Section 57-12-2(D). The definition of unfair or deceptive trade practices includes a nonexhaustive list of nineteen such acts. *See id.*

**{12}** "[P]erson" is defined as "natural persons, corporations, trusts, partnerships, associations, cooperative associations, clubs, companies, firms, joint ventures or syndicates[.]" Section 57-12-2(A). The Court of Appeals focused on the fact that GandyDancer fits the UPA definition of a person and concluded that under the broad language of the subsection establishing private remedies, GandyDancer could bring an action to recover any loss it experienced resultant from any unlawful method, act, or practice. *See Gandydancer*, 2018-NMCA-064, ¶ 20; *see also* § 57-12-10(B).

**{13}** Although a court begins its analysis "by looking at the language of the statute itself[,]" courts must "exercise caution in applying the plain meaning rule." *State v. Smith*, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022. "'Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning.'" *Id.* (quoting *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352). "In addition to looking at the statutory language, 'we also consider the history and background of the statute.'" *Id.* ¶ 10 (quoting *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939).

**{14}** The plain meaning rule must yield when "equity, legislative history, or other sources" demonstrate that applying the plain meaning would result in a construction "contrary to the spirit of the statute." *See id.* ¶¶ 9-10. "The law of statutory construction presumes that when the legislature amends a statute, it intends to change the existing law." *Wasko v. N.M. Dep't of Labor Employment*, 1994-NMSC-076, ¶ 9, 118 N.M. 82, 879 P.2d 83. This is key to our analysis because the Legislature amended the UPA to alter the specific acts prohibited. *See* 1971 N.M. Laws, ch. 240 (amending four sections of the original UPA and enacting a new section). We now turn to the statutory history of the UPA.

## 2. Statutory history of the UPA concerning competitive claims

**{15}** "The [UPA was] modeled after the Uniform Deceptive Trade Practices Act (Uniform Act)." *Stevenson v. Louis Dreyfus Corp.*, 1991-NMSC-051, ¶ 12, 112 N.M. 97, 811 P.2d 1308. *Stevenson* affirmed that the UPA "lends the protection of its broad application to innocent consumers." *Id.* (internal quotation marks and citation omitted). The Uniform Act proposed "a private remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising." *Id.* The creation of a private right of action does not automatically confer standing on all plaintiffs; courts must utilize the traditional tools of statutory interpretation, including the zone of interest protected, to determine whether the cause of action confers a right for a particular plaintiff to pursue a particular claim. *See Key*, 1996-NMSC-038, ¶ 11.

**{16}** The concept of the zone of interest is a tool of statutory construction and a requirement of general application. *See Key*, 1996-NMSC-038, ¶¶ 11, 14, 29-35 (applying the zone of interest to a statutorily created cause of action). The zone of interest applies to all statutorily created causes of action and limits who may assert a

statutorily created cause of action, and we presume the Legislature legislates consistent with this background limitation and consistent with our current jurisprudence. *See id.*; *see also State v. Chavez*, 2008-NMSC-001, ¶ 21, 143 N.M. 205, 174 P.3d 988 ("This Court presumes that the Legislature is aware of existing case law and acts with knowledge of it."). The zone of interest protected "may be apparent from the face of the statute or constitution, but more often than not the legislative history must be examined, a difficult or impossible task in New Mexico." *De Vargas Sav. & Loan Ass'n of Santa Fe v. Campbell*, 1975-NMSC-026, ¶ 13, 87 N.M. 469, 535 P.2d 1320. Thus, "we must look to the Legislature's intent as expressed in the [UPA] or other relevant authority" to determine whether GandyDancer has a cause of action under the UPA. *Key*, 1996-NMSC-038, ¶ 11.

**{17}** As the Court of Appeals has previously recognized, we agree that "[e]ven where a party demonstrates [injury], standing may be denied if the interest the complainant seeks to protect is not within the 'zone of interests' protected or regulated by the statute or constitutional provision the party is relying upon. The concepts of injury and zone of interest are thus intertwined." *City of Sunland Park v. Santa Teresa Services Co.*, 2003-NMCA-106, ¶ 40, 134 N.M. 243, 75 P.3d 843. The statute must provide protection against the injury alleged. *Id.* ¶ 41. And the identification of the interests protected by the statute allows a court to determine whether a plaintiff has demonstrated that the asserted interests fall within the zone of interest protected. *Id.* ¶ 42.

**{18}** Although we acknowledge that the broad language of the UPA suggests that any person meeting the minimum requirement of injury may bring a claim (no matter the type or how remote) the zone of interest bars such an expansive construction of Section 57-12-10(B). *See Key*, 1996-NMSC-038, ¶¶ 29-35 (holding that injury alone is not sufficient to confer standing or a cause of action if the interests a plaintiff seeks to protect lie outside the zone of interests protected by statute). The result in this case does not turn on whether GandyDancer is a person under the act, which by definition GandyDancer is. *See* § 57-12-2(A). Instead, the result turns on whether the Legislature intended the UPA to provide a competitor with a remedy for competitive injury. Stated another way, the result turns on whether the UPA protects GandyDancer's interest. We conclude that it does not.

**{19}** In its original form, the UPA was titled, "an act relating to unfair trade practices and consumer protection; making unfair methods of competition and unfair or deceptive acts or practices unlawful . . . and providing penalties." 1967 N.M. Laws, ch. 268. As originally enacted, the UPA defined and made unlawful "[u]nfair methods of competition." *See* 1967 N.M. Laws, ch. 268, § 2 (defining "[u]nfair methods of competition") and § 3 (declaring unfair methods of competition unlawful). The United States Supreme Court has observed that historically, "Although 'unfair competition' was a 'plastic' concept at common law . . . it was understood to be concerned with injuries to business reputation and present and future sales." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014) (citation omitted). However, in 1971, the Legislature removed "unfair methods of competition" from the text of the UPA, including its removal from the declaration of unlawful acts. *See* 1971 N.M. Laws, ch. 240, §§ 1, 2.

**{20}**     It logically follows that by removing the phrase "unfair methods of competition" from both the title and the definition section and from the declaration of unlawfulness, the Legislature intended to remove competitive injury claims from the protected zone of interest. *Compare* S.B. 233, 28th Leg., 1st Sess. (N.M. 1967) (including "unfair methods of competition" in the title and text of the UPA), *and* 1967 N.M. Laws, ch. 268, *with* S.B. 145, 30th Leg., 1st. Sess. (N.M. 1971) (removing "unfair methods of competition" from the title and text of the UPA), *and* 1971 N.M. Laws, ch. 240). The alteration evinces an intent to limit the zone of interest protected from unfair trade practices by the UPA to consumers, not competitors. *See Benavidez v. Sierra Blanca Motors*, 1996-NMSC-045, ¶ 18, 122 N.M. 209, 922, P.2d 1205 ("We also presume that the Legislature intends to change existing law when it enacts a new statute."). We recognize that the zone of interest concept embraced by *Key* observes that a plaintiff only needs to show that the plaintiff is arguably within the zone of interest protected. There is no requirement that evidence in the form of statutory language must establish that the Legislature included or excluded the particular plaintiff from the statute's protection. However, and especially considering the legislative history in this case, the statutory language is one of the most obvious and compelling factors.

**{21}**     Despite the broad language of Section 57-12-10(B), the UPA limits who may bring a cause of action because it links the right to bring a cause of action to prohibited conduct and defines unlawful conduct in specific terms. *See* § 57-12-3 ("Unfair or deceptive and unconscionable trade practices . . . are unlawful."); § 57-12-2(D) (defining "unfair or deceptive trade practice"); *cf. Key*, 1996-NMSC-038, ¶ 16 (holding that the New Mexico Motor Vehicle Dealers Franchising Act, NMSA 1978, §§ 57-16-1 to -16 (1995), "links standing to forbidden conduct and articulates forbidden conduct in specific terms" thus limiting the zone of interest protected).

**{22}**     GandyDancer argues that the phrase "unfair methods of competition" was superfluous and that its removal is therefore immaterial to the analysis. We disagree because construing "unfair methods of competition" to have been superfluous and its removal immaterial would require this Court to ignore the historical context wherein the Legislature enacted the UPA. *See Katz v. N.M. Dep't of Human Servs.*, 1981-NMSC-012, ¶ 18, 95 N.M. 530, 624 P.2d 39 ("A statute must be construed so that no part of the statute is rendered surplusage or superfluous."); *see also* Norman J. Singer & Shambie Singer, *Sutherland Statutory Constr.*, § 46.6, 238-47, 245 n.2, 247 n.3 (7th ed. 2014) ("Courts construe a statute to give effect to all its provisions, so that no part is inoperative or superfluous . . . ."). We decline to construe the prior inclusion of unfair methods of competition in the UPA to have been superfluous. This Court applies the principles of statutory construction to give effect to every phrase unless there is an obvious mistake or error. *Fowler v. Vista Care*, 2014-NMSC-019, ¶ 7, 329 P.3d 630 (stating that this Court "will not read any provision of the statute in a way that would render another provision of the statute 'null or superfluous'" (quoting *Rivera*, 2004-NMSC-001, ¶ 18)); *see also Sutherland Statutory Constr.*, *supra*, § 46.6, 256-59, 259 n.6 ("Courts assume that every word, phrase, and clause in a legislative enactment is intended and has some meaning and that none was inserted accidentally.")

**{23}** Although *Gandydancer*, 2018-NMCA-064, ¶ 24, posited that permitting standing to pursue competitive injury could tangentially benefit consumers, such a construction of public policy does not appear to be supported by the statutory history. It is within the purview of the Legislature to expand the zone of interest protected by the UPA to include competitor suits for competitive injury if that is a policy that the Legislature decides to pursue, but this Court should refrain from creating policy. *See State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 21, 125 N.M. 343, 961 P.2d 768 ("'[I]t is the particular domain of the legislature, as the voice of the people, to make public policy.'" (quoting *Torres v. State*, 1995-NMSC-025, ¶ 10, 119 N.M. 609, 894 P.2d 386)). Mindful of that guiding principle, this Court will not expand the zone of interest protected by UPA after it has been limited by the Legislature.

### 3.     The UPA Should Not Be Construed in a Manner That Ultimately Undermines Consumer Protection

**{24}** With consumer interests in mind, we again observe that this Court has directed New Mexico courts to "ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 48, 329 P.3d 658 (internal quotation marks and citation omitted). The Legislature intended the UPA to serve as remedial legislation for consumer protection, and "we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent." *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 30, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citations omitted). *Gandydancer*, 2018-NMCA-064, ¶ 24, observed that "New Mexico recognizes a strong public policy against unlicensed contractors." (citations omitted) (reasoning however that "[t]he licensure requirements of CILA clearly implicate consumer protection concerns and trade practices addressed to the market generally such that . . . a competitor [plaintiff] who is able to show that it suffered a loss of money or property as a result of the [defendant's] misrepresentation" of licensure to a consumer is entitled to assert a cause of action under the UPA). We respectfully disagree with the reasoning.

**{25}** Although the UPA and CILA both implicate consumer protection concerns, the acts implement their respective policies through different methodologies: CILA permits consumers to withhold or recoup payments from unlicensed contractors while the UPA provides consumers with a cause of action for damages, including treble damages. *Compare* § 60-13-30(A) (prohibiting unlicensed contractors from bringing an action for the collection of compensation "for the performance of any act for which a license is required"), *and Mascarenas v. Jaramillo*, 1991-NMSC-014, ¶¶ 10-16, 111 N.M. 410, 806 P.2d 59 (holding that under CILA a consumer may withhold payments from and bring an action to recover payments made to unlicensed contractors), *with* § 57-12-10(B) (establishing a cause of action for damages resultant from an act the UPA has "declared unlawful"). Notwithstanding that the UPA *does not* declare competitive injury unlawful, GandyDancer's reasoning suggests an extreme position that a competitor claim asserted pursuant to the UPA could take priority over a consumer claim under CILA.

**{26}** For example, employing the remedies available under CILA, BNSF could assert a claim for all payments made to Rock House for work performed by Rock House while unlicensed. *See Mascarenas*, 1991-NMSC-014, ¶ 16 (reversing an award of partial refund with instructions to award a full refund to a consumer who made payments to an unlicensed contractor). However, if the UPA permits a competing contractor to recover loss profits damages as GandyDancer suggests, such recovery could effectively displace a consumer's remedies. For example, if GandyDancer were allowed to recover damages under the UPA, and such recovery totaled all of the Rock House assets such that Rock House was rendered bankrupt or judgment proof, the consumer, in this case BNSF, could be effectively precluded from recovering damages under CILA.

**{27}** Stated more generally, the UPA could be used in a manner that thwarts its primary purpose of protecting innocent consumers if competitors are allowed to assert a competitive injury claim under the UPA and thereby displace a consumer's remedies under CILA. We must avoid construing the UPA and CILA in a manner that would result in conflict because "[w]e are charged with the responsibility of construing statutes harmoniously when possible." *State ex rel. Brandenburg v. Sanchez*, 2014-NMSC-022, ¶ 11, 329 P.3d 654; *accord Luboyeski v. Hill*, 1994-NMSC-032, ¶ 10, 117 N.M. 380, 872 P.2d 353 ("Whenever possible, we must read different legislative enactments as harmonious instead of as contradicting one another.").

**{28}** The Court of Appeals analysis does not account for such a result and thus sows potential conflict between CILA and the UPA. "If statutes appear to conflict, they must be construed, if possible, to give effect to each." NMSA 1978, § 12-2A-10(A) (1997). We likewise presume that the Legislature is aware of New Mexico case law construing the purpose of the UPA as protecting innocent consumers. *See Chavez*, 2008-NMSC-001, ¶ 21 ("The Legislature's continuing silence [since the 1971 amendments] on the issue [of UPA focus on consumer protection] is further evidence that it was both aware of and approved of the existing case law."). We therefore presume that the Legislature is mindful of the tension between the UPA and CILA and has limited the zone of interest protected under the UPA to harmonize the acts in advancement of the public policy of protecting innocent consumers, and we decline to expand the zone of interest under the UPA without express direction from the Legislature.

**C.    Prior New Mexico Case Law Does Not Establish That the UPA Created a Cause of Action for Competitive Injury**

**{29}** New Mexico cases have historically interpreted the UPA to focus exclusively on consumer protection, protecting "innocent consumers." *B & B Inv. Grp.*, 2014-NMSC-024, ¶ 48, ("It is the task of the courts to ensure that the [UPA] lends the protection of its broad application to innocent consumers." (internal quotation marks and citation omitted)). Although the general intent of the UPA is clear, as federal cases from the District of New Mexico have acknowledged, no prior New Mexico case has specifically addressed whether the UPA supports a cause of action for competitive injury. *See e.g., First Nat'l Bancorp Inc. v. Alley*, 76 F. Supp. 3d 1261, 1266 (D.N.M. 2014) (observing that prior New Mexico case law does not analyze the question of "competitor standing");

*Navajo Nation v. Urban Outfitters, Inc.*, 935 F. Supp. 2d 1147, 1177 (D.N.M. 2013) (observing that "there is no controlling authority" from New Mexico appellate courts construing a cause of action for "business competitor standing" under the UPA and proposing to certify the question to this Court). We take this opportunity to clarify that the existing New Mexico case law cited by the parties to support their positions is not applicable to the question before the Court. Further, we reject the use of dicta in *Page & Wirtz*, 1990-NMSC-063, ¶ 22, as authority to support the position that the UPA permits a cause of action for competitive injury.

**{30}** We begin with the applicability of *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 2005-NMCA-051, 137 N.M. 524, 113 P.3d 347, from which both parties argue in support of their respective positions. *Santa Fe Custom Shutters* did not address whether the Legislature created a cause of action for competitive injury under the UPA. Instead, *Santa Fe Custom Shutters* determined that a seller of custom windows could not assert a claim against a buyer who agreed to purchase windows. *Id.* ¶ 17 ("Consistent with its purpose as consumer protection legislation, the UPA gives standing only to buyers of goods and services." (citation omitted)). In this instance, as competitors neither GandyDancer nor Rock House is in the position of being a buyer or a seller to the other, and therefore *Santa Fe Custom Shutters* is not applicable.

**{31}** The parties likewise argue the applicability of *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, 142 N.M. 437, 166 P.3d 1091. GandyDancer argues that *Lohman* supports the determination of legislative intent to establish a competitive cause of action, and Rock House argues the opposite. *Gandydancer* concluded that *Lohman* supported a competitive injury claim in the UPA because "'both the plain language of the act and the underlying policies suggest that a commercial transaction between a claimant and a defendant need not be alleged in order to sustain a UPA claim.'" 2018-NMCA-064, ¶ 13 (quoting *Lohman*, 2007-NMCA-100, ¶ 33).

**{32}** Deriving a competitive injury cause of action from the language of *Lohman* ignores the context of that case. *Lohman* is inapposite. It analyzed "whether a false or deceptive statement, made by a manufacturer and its testing laboratory to a dealer or distributor, for the purpose of facilitating sales of a product to consumers at large, should fall within the scope of the UPA." *Lohman*, 2007-NMCA-100, ¶ 25. In allowing a consumer claim to move forward, the Court of Appeals held that the UPA does not necessarily require a direct transaction between the consumer and a defendant that supplied parts incorporated in the goods purchased when the defendant's "misrepresentations . . . bear on downstream sales." *Id.* ¶¶ 25-26, 29-30.

**{33}** In *Hicks v. Eller*, the Court of Appeals clarified that although *Lohman* "does not require a transaction between a claimant and a defendant, *Lohman* does stand for the proposition that the plaintiff must have sought or acquired goods or services and the defendant must have provided goods or services." *Hicks v. Eller*, 2012-NMCA-061, ¶ 20, 280 P.3d 304. *Hicks* addressed whether a seller of goods could bring an action against a buyer under the UPA, albeit under slightly different circumstances from *Santa Fe Custom Shutters. See Hicks*, 2012-NMCA-061, ¶¶ 1-2.

**{34}** Eller was an art appraiser who purchased two paintings from Hicks, the seller, which Eller thereafter sold for a significant profit to an art dealer (and where the paintings were ultimately sold at auction for a much greater amount than even Eller received). *Id.* ¶¶ 8-9. *Hicks* simply clarified the *Lohman* holding that a direct transaction was not required but provided no supporting authority for the argument that the UPA establishes a cause of action for competitive injury. *See Hicks*, 2012-NMCA-061, ¶¶ 20-21.

**{35}** Finally, the thrust of GandyDancer's argument rests upon dicta from *Page & Wirtz*, where this Court speculated that the broad language of Section 57-12-10(B) could theoretically include damages "suffered either by a consumer of goods or services, or the commercial competitor of an enterprise engaged in deceptive trade practices." *Page & Wirtz*, 1990-NMSC-063, ¶ 22. However, *Page & Wirtz* did not address competitive injury.

**{36}** Instead, *Page & Wirtz* held that the restaurant owner, the buyer of services, was only entitled to treble the statutorily set amount recoverable against a contractor under the UPA because the buyer did not prove actual damages. *Page & Wirtz*, 1990-NMSC-063, ¶¶ 17, 20-23; *see also* § 57-12-10(B) (providing for "an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater"). In a hypothetical discussion of remedies authorized under the UPA, *Page & Wirtz* theorized that the plain language of the statute could be broad enough to contemplate the possibility of a competitor's cause of action for damages or injunctive relief, but that dicta was both unnecessary to the holding and unsupported by analysis. *Id.* ¶¶ 21-22. To the extent the statement stands as an expression of New Mexico law that the UPA authorizes such a claim, we disavow the statement.

## D. The Case Law from Other States Interpreting Other State Law Is Unpersuasive

**{37}** *Gandydancer* relies on case law from other state and federal courts to support its conclusion that the UPA creates a cause of action for competitive injury. *See* 2018-NMCA-064, ¶¶ 18-19. The Court of Appeals reasoned that its conclusion was supported because "courts in other jurisdictions have also used legislative intent paired with statutory interpretation principles, including the liberal construction of remedial statutes, to interpret statutory language authorizing any person to bring a state consumer protection claim." *Id.* ¶ 18 (internal quotation marks and citation omitted).

**{38}** We agree that it is appropriate to "look for guidance in analogous law in other states or the federal system" if New Mexico case law does not answer the question presented. *See Wills v. Bd. of Regents of Univ. of N.M.*, 2015-NMCA-105, ¶ 19, 357 P.3d 453 (internal quotation marks and citation omitted). However, interpretations of the laws of other jurisdictions provide guidance only if the analogous law is substantially similar to the UPA. Respectfully, *Gandydancer* relies predominantly on jurisdictions analyzing statutes not substantially similar to the UPA, with *different* statutory language and a *different* statutory history as we note next. Such interpretations are not binding on

this Court. *See Security Ins. Co. of Hartford v. Chapman*, 1975-NMSC-052, ¶ 19, 88 N.M. 292, 540 P.2d 222 ("Of course, the decisions of other states, if any, which have statutory provisions comparable to ours, with which we are here concerned, are persuasive but not binding.").

**{39}** Insofar as *Gandydancer* relied on case law from other states interpreting statutes that include anticompetitive provisions, those cases are unpersuasive because the Legislature removed such provisions from the UPA. For example, *Eder Brothers, Inc. v. Wine Merchants of Connecticut, Inc.*, 880 A.2d 138, 149 (Conn. 2005), based its decision on language in the Connecticut Unfair Trade Practices Act: "'[N]o person shall engage in *unfair methods of competition* and unfair or deceptive acts or practices in the conduct of any trade or commerce.'" (emphasis added) (quoting Conn. Gen. Stat. § 42-110b(a) (1976)). *Southern Service Corp. v. Excel Building Services, Inc.*, 617 F. Supp. 2d 1097, 1099-1100 (D. Nev. 2007), focused on language from the Nevada Unfair Trade Practices Act (NUTA). NUTA importantly provided, "'Evidence that a person has engaged in a deceptive trade practice is prima facie evidence of intent to injure *competitors* and to destroy or substantially lessen *competition*.'" *Id.* (emphasis added) (quoting Nev. Rev. Stat. § 598.0953(1) (2007, amended 2017)). *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 39-41 (Ill. App. Ct. 1989), analyzed an Illinois statute which declared, as unlawful, "[u]*nfair methods of competition* . . . including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact . . . ." (emphasis added) (quoting 815 Ill. Comp. Stat. 505/2 (1973)). These statutes specifically refer to unfair methods of competition or competitive injury. The New Mexico Legislature has taken the deliberative action to exclude those references from the UPA.

**{40}** *Gandydancer* cites one case that construed statutes that do not specifically use the term "unfair methods of competition." *See John Labatt Ltd. v. Molson Breweries*, 853 F. Supp. 965, 969-970 (E.D. Mich. 1994). However, in that case, the federal district court construed the Michigan Consumer Protection Act (MCPA) to permit competitor standing in an unfair competition claim by applying reasoning from other federal courts and not from Michigan appellate courts. *Labatt*, 853 F. Supp. at 967-70. *Labatt* also lacks a thorough analysis concerning the statutory history and development of the MCPA.

**{41}** In light of the unique statutory history of the UPA, we conclude that the case law from other states on which the Court of Appeals relied is unpersuasive.

## III.    CONCLUSION

**{42}** Based on the foregoing, we reverse the Court of Appeals and remand to the district court for dismissal of the UPA claim and for further proceedings consistent with this opinion.

**{43}    IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**BARBARA J. VIGIL, Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**